1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

8  CURTIS OWENS,                          )  1:03-cv-5327-AWI-TAG HC
                                          )
9          Petitioner,                    )  REPORT AND RECOMMENDATION
                                          )  TO DENY FIRST AMENDED PETITION
10    v.                                  )  FOR WRIT OF HABEAS CORPUS
                                          )
11  E. ROE,                               )  (Doc. 11)
                                          )
12          Respondent.                   )
    _____)

13

14       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

15  pursuant to 28 U.S.C. § 2254.

16                          **PROCEDURAL HISTORY**

17       Petitioner is in custody of the California Department of Corrections serving two concurrent

18  indeterminate sentences of 25 years-to-life pursuant to a judgment of the Superior Court of

19  California, County of Fresno.  On November 5, 1999, Petitioner was convicted by jury of burglary,

20  attempted burglary, and possession of burglary tools. (Cal. Pen. Code §§ 459, 466, 664). (Clerk's

21  Transcript on Appeal ("CT"), 67-71).  In a bifurcated court trial, the state court found that Petitioner

22  had suffered six prior "serious" or "violent" felonies that qualified as strikes under California's

23  "Three Strikes" law (Cal. Pen. Code §§ 667(d) & (e)).  (Reporter's Transcript on Appeal ("RT")

24  336-337).  On December 3, 1999, Petitioner was sentenced to two concurrent indeterminate terms of

25  25 years-to-life with the possibility of parole.  (CT 247-248; RT 426).

26       Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth

27  Appellate District (the "5th DCA"), and on March 30, 2001, the 5th DCA, in an unpublished

28  decision, affirmed Petitioner's conviction and sentence.  (Doc. 18, Exh. B).  Subsequently, Petitioner

1    filed a petition for review in the California Supreme Court, which was denied on June 13, 2001.

2    (Doc. 18, Exh. C).

3           On August 30, 2002, Petitioner filed a state habeas petition in the California Supreme Court.

4    (Doc. 18, Exh. D).  In that petition, Petitioner raised four issues: (1) violation of his 5th and 14th

5    Amendment rights when he was not read his <u>Miranda</u> rights before making statements; (2)

6    insufficient evidence to support his convictions; (3) ineffective assistance of trial counsel in not

7    asserting Petitioner's 5th and 14th Amendment rights; and (4) ineffective assistance of appellate

8    counsel in not looking into the issue of the purported Miranda violation.  (<u>Id.</u>).   On February 11,

9    2003, the petition was denied.  (Doc. 18, Exh. E).

10          On March 17, 2003, Petitioner filed his original federal petition in this case.  (Doc. 1).  On

11   June 26, 2003, pursuant to this Court's order, Petitioner filed his First Amended Petition, raising the

12   five issues now before the Court.  (Doc. 11)   On October 17, 2003, Respondent filed his answer.

13   (Doc. 18).  On November 18, 2003, Petitioner filed his Traverse.  (Doc. 19).

14          Respondent concedes that Petitioner's four grounds for relief in this petition have been fully

15   exhausted.  (Doc. 18, p. 3).

16                                          **FACTUAL BACKGROUND**

17          On August 12, 1999, Harold Fielding, a paramedic supervisor for American Ambulance, was

18   returning in an ambulance to the company parking lot with his partner when he observed someone

19   standing by his car.  (RT 119-120).  The suspect was an African-American male about 5'9" tall and

20   weighing about 180 pounds.  (RT 121).  The man, subsequently identified by Fielding as Petitioner,

21   appeared to be looking into Fielding's car.  (RT 121;126).  Fielding and his partner continued driving

22   into the parking lot, then stopped the ambulance, and got out.  (<u>Id.</u>).  At that point, Petitioner, who

23   had been standing next to Fielding's car, apparently saw Fielding, went around the back of the car,

24   and crouched or sat down near the rear bumper.  (<u>Id.</u>).

25          Fielding immediately noticed that the front window was broken out of his car and there was a

26   toolmark underneath the door-latch mechanism.  (RT 124).  He noticed that a nearby car, a gold

27   Honda Accord, also had a broken window.  (RT 128).  Fielding notified the company dispatcher that

28   a possible break-in of his car had occurred.  (RT 125).  Another employee, Stephen Flick, heard

Fielding's report on the radio and joined Fielding and his partner as they walked toward Fielding's car. (RT 125).

As the three approached Petitioner, the latter moved away from Fielding's car and left the parking lot. (RT 125). Before leaving, he said to Fielding, "I didn't do anything." (RT 135). Fielding observed that Petitioner had a blue bandana in his hand. (RT 136). Fielding and Flick followed Petitioner until they lost him near some court buildings. (RT 127). Fielding then saw a police officer and talked to him, giving him Petitioner's description. (RT 127; 131). Shortly thereafter, Fielding heard on the company radio that Flick had located Petitioner hiding nearby. (RT 132). Fielding went to assist Flick and found the two standing in the street. (Id.). Petitioner was wearing the same clothes Fielding had observed earlier in the parking lot. (Id.). The police arrived almost simultaneously with Fielding. (Id.). Nothing was missing from Fielding's car. (RT 133).

Flick testified that he responded to Fielding's radio call about assistance in the parking lot. (RT 165). When he arrived, Flick saw Fielding and his partner in the parking lot and saw a man running from Fielding's car. (RT 166). Fielding told Flick someone had just broken into his car and another car in an adjacent row and that the suspect was walking across the parking lot. (RT 166). Flick said, "Let's go get him," and started running after Petitioner. (RT 166). Petitioner started running as well. (RT 167). Flick turned back to see if others were following him and when he turned back, Petitioner had disappeared. (RT 167).

Flick notified the dispatcher of his location and waited for police to arrive and also to see if there was any movement in the bushes. (RT 168). Flick then heard some rustling behind a brick wall so he looked over the top of the wall and saw Petitioner lying against the wall with his arms crossed down near his waist and a hat over his face. (RT 169). Flick notified police via his radio at which point Petitioner jumped up and said, "I don't know what you're talking about." (RT 170).

Flick told Petitioner to sit down, and Petitioner put his hands up in the air and started yelling "he didn't know what [Flick] was talking about, it wasn't him, and that you have the wrong person." (RT 171). Flick told him to sit down until police arrived. (Id.). Petitioner then put a blue bandana in his pocket. (Id.). Flick noticed a screwdriver next to Petitioner's foot that he later pointed out to the police officer, who picked it up. (RT 171).

1        Brady Gilman, another ambulance company employee, testified that he had driven to work in

2   a Honda Accord owned by a friend, Scott Mooneyham.  (RT 181).  He locked the car and the

3   windows were intact at that time.  (RT 182).  Later, Gilman was notified that the car may have been

4   broken into, so he went to the parking lot and saw that the side window had been shattered.  (RT

5   182).  Gilman also observed that the inside of the car had been "gone through," the center console

6   was open, and various items were scattered all over the car.  (Id.).  Gilman also observed multiple

7   pry marks on the door.  (RT 183).

8        Wendell Austin, a Fresno Police Department officer, testified that he investigated the two car

9   burglaries and interviewed the victims.  (RT 143).  At trial, he testified that when he apprehended

10  Petitioner he had a pair of Nike gloves and that Flick drew Austin's attention to a screwdriver lying

11  near Petitioner.  (RT 195).  Austin noted that the area where Petitioner had been lying at the base of

12  the wall had an imprint of two legs with the screwdriver in between, as if Petitioner had been lying

13  there with the screwdriver between his legs.  (RT 201).  Austin asked Petitioner to remove his shoes,

14  and when he did, several pieces of safety glass like those found in automobiles fell out.  (RT 197).[1]

15       Scott Mooneyham testified that he lent his Honda Accord to a friend, Gilman, so he could

16  drive to work.  (RT 223).  Gilman returned the car with a smashed passenger window and pry marks

17  on the rubber around the window.  (RT 223).

18       Petitioner was charged with two counts of second degree burglary for the burglarizing of

19  Fielding's and Mooneyham's cars.  (CT 50-51.)  Petitioner was also charged with one count of

20  possession of burglary tools, i.e., the screwdriver.  (CT 51).  The information also charged Petitioner

21  with six prior serious or violent felonies within the meaning of the Three Strikes law.  (Id.).  The jury

22  found Petitioner guilty of the lesser included offense of attempted burglary of Fielding's car, but

23  found him guilty of the burglary of Mooneyham's car.  (CT 68; 69).  The jury also found Petitioner

24  guilty of possession of burglary tools.  (CT 70).  The trial court later found that Petitioner had

25  committed six prior serious or violent felonies within the meaning of the Three Strikes Law.

26

27       [1]Although a cassette tape, The Best of the Doors, was found on Petitioner when Austin
28  confronted him, and apparently later determined that it had been taken from the Honda, that fact was
never established at trial.  (RT 409).

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7, 120 S.Ct. 1495 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).  Accordingly, the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059(holding the AEDPA only applicable to cases filed after statute's enactment).  The instant proceedings were initiated by the filing of the original petition on March 17, 2003, after the enactment of the AEDPA, and thus this case is governed by the AEDPA.

**II.  Legal Standard of Review**

A petition for writ of habeas corpus under 28 U.S.C. 2254(d) will not be granted unless the adjudication of a prisoner's claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71, 123 S.Ct. 1166 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

The first prong of federal habeas review involves the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and mixed questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established federal law "if it

applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141, 125 S.Ct. 1432 (2005), citing Williams v. Taylor, 529 U.S. at 405. A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Brown v. Payton, 544 U.S. at 141. Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511, 123 S. Ct. 2527 (2003), citing Williams v. Taylor, 529 U.S. at 409. Section 2254(d)(1)'s reference to "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412; Lockyer v. Andrade, 538 U.S. at 412; Barker v. Fleming, 423 F. 3d 1085, 1093 (9th Cir. 2005).

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment"). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038, 125 S.Ct. 809 (2004). The AEDPA also requires that considerable deference be given to a state court's factual findings. A state court's factual findings are  presumed to be correct, and such presumption of correctness may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

///

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court must independently review the record to determine whether habeas corpus relief is available under § 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 981-982 (9th Cir. 2002). Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

**III. Review of Petitioner's Claims.**

The instant First Amended Petition alleges the following as grounds for relief:

| | |
|---|---|
| Ground One | The trial court erred in admitting inculpatory statements by Petitioner in violation of his 5th and 14th amendment rights. |
| Ground Two | The State failed to prove every element of the charge of burglary beyond a reasonable doubt in that insufficient evidence of "entry" was presented. |
| Ground Three | Petitioner was denied the effective assistance of both trial and appellate counsel.[2] |
| Ground Four | The trial court erred in instructing the jury with CALJIC No. 17.41.1. |

**Ground One            The trial court erred in admitting inculpatory statements by Petitioner in violation of his 5th and 14th amendment rights.**

Petitioner contends that the state court violated his constitutional rights under the 5th and 14th amendments when the trial court permitted the prosecution to elicit testimony regarding Petitioner's answers to Officer Austin's query about his name and what he was doing in the area. (Doc. 11, p. 2). Petitioner contends that the statements were utilized to place him at the scene and to implicate him in the crimes. (Id.). This contention lacks merit.

---

[2] Because both allegations of ineffective assistance stem primarily from counsel's purported failure to assert error based on the lack of Miranda warnings, the Court will address them as a single argument.

A. <u>Procedural and Factual Background</u>.

Outside the presence of the jury, Austin testified that he investigated the two car burglaries. (RT 143). When Austin arrived at Petitioner's location, Petitioner had been behind a brick wall and some bushes, but then sat on the wall. (RT 144, 146). Austin asked Fielding if Petitioner was the man Fielding had seen around his car and Fielding answered affirmatively. (RT 144).

Austin asked Petitioner preliminary questions such as, "What are you doing here?  What's your name?" (RT 144). Petitioner said that he had come to the parking lot from Tulare and that he was lying down in the bushes because he was homeless. (RT 144). He said he did not know anything about the burglaries or what had happened in the parking lot. (<u>Id.</u>). Austin was carrying weapons but did not have them drawn. (RT 145). At that point, Petitioner was not arrested nor was he handcuffed, but he was detained for the purpose of investigation. (RT 145).

A warrant search conducted by Austin disclosed that Petitioner was a parolee. (RT 157). Austin then conducted a pat-down search of Petitioner for weapons. (RT 152). Austin found a cassette tape on Petitioner and asked him if he knew anything about the car burglaries in the ambulance parking lot. (RT 153). Petitioner said he had not been in that area and knew nothing about the burglaries. (<u>Id.</u>). Austin then asked him where he had gotten the cassette, and Petitioner said, "It's mine." (RT 153-154). Austin did not believe Petitioner and placed him under arrest. (RT 154; 156).

The prosecution argued that Petitioner was not in custody at the time he made these statements and therefore <u>Miranda</u> did not apply. (RT 147). The defense countered that Petitioner was not free to leave and that the presence of police officers carrying weapons and ambulance drivers who had vehicles with lights was collectively coercive. (RT 148).

The trial court ruled that the initial questions about Petitioner's name and what he was doing in the area were preliminary questions that did not require <u>Miranda</u> warnings; however, the subsequent questions about the cassette tape and Petitioner's knowledge of the burglaries required an admonition under <u>Miranda</u> because at that point the investigation had focused on Petitioner and he was not free to leave. (RT 158). The court also excluded any reference to Petitioner being on parole. (RT 158).

1    At trial, Austin testified essentially as he had in the <u>Miranda</u> hearing, but he was not

2    permitted to testify regarding any of Petitioner's comments that had been excluded.  (RT 194).

3       B.  <u>General Principles of Miranda</u>.

4       Whether a statement violated <u>Miranda</u>, was involuntary, or coercive is a legal question

5    requiring independent federal determination.  <u>Arizona v. Fulminante</u>, 499 U.S. 279, 286, 111 S.Ct.

6    1246 (1991); <u>Miller v. Fenton</u>, 474 U.S. 104, 110, 106 S.Ct. 445(1985); <u>Campbell v. Wood</u>, 18 F.3d

7    662, 672 (9th Cir. 1994).  Under <u>Miranda</u>, a person in custody must be informed before interrogation

8    that he has a right to remain silent and to have a lawyer present.  <u>Miranda v. Arizona</u>, 384 U.S. 436,

9    86 S.Ct. 1602 (1966).   If a person in custody states "that he wishes to remain silent, the interrogation

10   must cease." <u>Id.</u>, 384 U.S. at 473-73.

11      Whether a person is in "custody or otherwise deprived of his freedom of action in any

12   significant way," <u>Miranda</u>, 384 U.S. at 444, is answered:

13   > "by reviewing the totality of facts involved at the time of the alleged restraint.
>    Pertinent areas of inquiry include the language used by the officer to summon the
14   > individual, the extent to which he or she is confronted with evidence of guilt, the
>    physical surroundings of the interrogation, the duration of the detention and the degree
15   > of pressure applied to detain the individual.  Based upon a review of all the pertinent
>    facts, the court must determine whether a reasonable innocent person in such
16   > circumstances would conclude that after brief questioning he or she would not be free
>    to leave."

17   <u>United States v. Booth</u>, 669 F.2d 1231, 1235 (9th Cir. 1981).  The determination of whether a

18   suspect is in custody for <u>Miranda</u> purposes must be made on a case-by-case basis.  <u>Id.</u> at 1238.

19      Interrogation, the second requirement under <u>Miranda</u>, can be "either express questioning or

20   its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-301, 100 S. Ct. 1682 (1980).

21   The latter includes any statement or actions "that the police know are reasonably likely to elicit an

22   incriminating response from the suspect." <u>Id.</u> at 301.

23      However, not every question posed in a custodial setting is equivalent to "interrogation."

24   <u>Booth</u>, 669 F.2d at 1237.  Many sorts of questions do not, by their very nature, involve the

25   psychological intimidation that <u>Miranda</u> is designed to prevent.  <u>Id.</u>  A definition of interrogation that

26   included any question posed by a police officer would be broader than that required to implement the

27   policy of <u>Miranda</u> itself, which is to act as a "prophylactic device" to protect a suspect's Fifth

28

Amendment right from the pressures of custodial interrogation, which itself "contains inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely." Id., quoting Miranda, 384 U.S. at 467.

Incriminating custodial statements are rendered inadmissible only if, under the totality of the circumstances, they are reasonably like to elicit an incriminating response from the suspect. Booth, 669 F.2d at 1237; see Innis, 446 U.S. at 300-02; see also Siripongs v. Calderon, 35 F3d 1308, 1319-20 (9th Cir. 1994). The mere fact of custody is insufficient to make an incriminating statement inadmissible. Siripongs, 35 F.3d at 1319. This must be determined on a case-by-case basis and is an objective test wherein the subjective intent of the police, while relevant, is not conclusive. Booth, 669 F.2d at 1238; Innis, 446 U.S. at 302 n. 8, 110 S. Ct. at 1690.

Ordinarily, the routine gathering of background biographical data will not constitute interrogation. Booth, 669 F.2d at 1238. Asking a defendant his name, birth date, address and the like falls within an exception to Miranda that exempts questions needed to secure the information necessary to complete booking or pretrial services. See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 598-600, 110 S. Ct. 2638 (1990); see also United States v. Perez, 776 F.2d 797, 799 (9th Cir. 1985) overruled on other grounds in United States v. Cabaccang, 332 F.3d 622 (9th Cir. 2003) (routine gathering of background biographical data does not constitute interrogation sufficient to trigger constitutional protections). However, when an officer has reason to know that a suspect's answer may incriminate him, even routine questioning may amount to interrogation. See Innis, 446 U.S. at 301.

Nor do Miranda's requirements apply when a police officer is making a "Terry" stop. Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138 (1984). Under the Fourth Amendment, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly, in order to "investigate the circumstances that provoke suspicion." United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574 (1975). The "stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Id., quoting Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868 (1968).

"Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released."  Berkemer, 468 U.S. at 439-440.  This may include questions that ask the detainee to "explain suspicious circumstances."  Brignoni-Ponce, 422 U.S. at 882.  "The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda."  Berkemer, 468 U.S. at 439-440.

In Berkemer, the Supreme Court articulated a similar rule for roadside questioning of a motorist detained pursuant to a routine traffic stop, concluding that police questioning conducted in public, such as in the instant case, is qualitatively different from that conducted at the station house:

> Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced to "speak where he would not otherwise do so freely."  First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief.  The vast majority of roadside detentions last only a few minutes....In this respect, questioning incident to an ordinary traffic stop is quite different from station-house interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.
>
> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police....Perhaps most importantly, the typical traffic stop is public, at least to some degree.  Passersby, on foot or in other cars, witness the interaction of officer and motorist.  This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorists fear that, if he does not cooperate, he will be subjected to abuse...
>
> In both of these respects, the usual traffic stops is more analogous to a so-called "Terry stop...."

Berkemer, 468 U.S. at 439.

C.  Petitioner's Responses Did Not Require Miranda Warnings.

At the Miranda hearing in this case, the trial judge evidently came to the conclusion that the two questions—"What is your name?" and "What are you doing here?"—were part of a Terry stop because the court concluded that these two statements were "investigatory." (RT 158).  Regarding the initial question asking Petitioner his name, the trial court noted that "asking a person their name for purposes of identification is generally not considered that form of custodial interrogation, which

1   requires a <u>Miranda</u> admonition."  (RT 149).

2        The court then considered the second question, "What are you doing here?", and asked itself

3   the appropriate question whether such a query was "an interrogation or was it merely investigatory in

4   the sense of finding out whether the person is there for a–by accident or for some other legitimate

5   purpose, such as being employed in the area, waiting for someone at the depot, things of that type."

6   (RT 149).   As the trial court correctly observed, "a brief investigatory investigation, is so that you

7   will not arrest someone who is–who has an explanation for their presence...." (RT 150).  After

8   noting the "fine line" between what the court termed "investigatory questions" asked only "for

9   identification and why you're here" and questions that involve the detainee's "submission to police

10  authority in responding,"  the court concluded that both of the initial two questions were

11  "investigatory."  (RT 150-151).

12       Although the term "investigatory," as used here by the trial court, is not as unambiguous as,

13  for example, "questions asked pursuant to a <u>Terry</u> stop" or  "questioning during an investigatory

14  detention" would have been, the intent and legal import of the trial court's ruling is nevertheless

15  clear in this case:  the court considered the two questions to be preliminary questions conducted

16  pursuant to a short investigatory detention of Petitioner by Austin without full probable cause to

17  arrest Petitioner, but certainly with reasonable suspicion to believe that Petitioner may have been

18  involved in criminal activity.

19       This analysis is further supported by the court's conclusion that, following the pat-down

20  search in which the cassette tape was discovered, subsequent statements had to be excluded because

21  the questions regarding ownership of the tape led Austin to believe that Petitioner was lying, thus

22  giving him probable cause to arrest Petitioner.  Thus, this Court agrees with the state trial court's

23  analysis that Petitioner's answers to these two preliminary questions were beyond the ambit of

24  <u>Miranda</u>, and therefore the trial court did not err in admitting the statements at trial.   <u>Brignoni-</u>

25  <u>Ponce</u>, 422 U.S. at 882;  <u>Berkemer</u>, 468 U.S. at 439-440.

26       Having reached this conclusion, it is also apparent that the state appellate courts, in denying

27  Petitioner's habeas corpus petition on the <u>Miranda</u> issue, did not make a determination that was

28  ///

1   contrary to or an unreasonable application of clearly established federal law.  Accordingly, Ground

2   One must be denied.

3   **Ground Two**          **The State failed to prove every element of the charge of burglary beyond
                            a reasonable doubt in that insufficient evidence of "entry" was presented.**

4

5          Petitioner next contends that insufficient evidence was presented to support the "entry"

6   element of burglary of the Honda, since no one saw Petitioner near the car or saw him break the

7   window.  (Doc. 11, p. 6).  The Court agrees with Respondent that this argument is specious.

8          **A.  Standard of Review For Sufficiency of the Evidence.**

9          The law on sufficiency of the evidence is clearly established by the United States Supreme

10  Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307,

11  99 S.Ct. 2781 (1979), the test on habeas review to determine whether a factual finding is fairly

12  supported by the record is as follows:

13          "[W]hether, after viewing the evidence in the light most favorable to the
            prosecution, any rational trier of fact could have found the essential elements
14          of the crime beyond a reasonable doubt."

15  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781, 110 S.Ct. 3092 (1990).  Thus,

16  only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a

17  petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by

18  the elements defined by state law.  Id. at 324, n. 16.[3]

19          It appears to be an open question in the Ninth Circuit whether the AEDPA adds a second

20  level of deference to this standard, so that a federal habeas petitioner may obtain relief only by

21  demonstrating that the state court's adjudication on the merits of the claim involved an unreasonable

22  application of Jackson's "no rational trier of fact" standard.  See Garcia v. Carey, 395 F.3d 1099,

23  1102 (9th Cir. 2005); Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004)(en banc).  However, this

24  Court need not address that issue because the same result is reached whether the record is reviewed

25  directly under Jackson or under the more deferential filter of the AEDPA standard.  See id.

26

27          [3]In reviewing sufficiency of evidence claims, California courts expressly follow the standard
28  enunciated in Jackson.  See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v.
    Thomas, 2 Cal.4th 489, 513 (1992).

1    This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

2  § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of

3  correctness applies to state appellate determinations of fact as well as those of the state trial courts.

4  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does

5  not apply to state court determinations of legal questions or mixed questions of law and fact, the

6  facts as found by the state court underlying those determinations are entitled to the presumption.

7  Sumner v. Mata, 455 U.S. 591, 597, 102 S. Ct. 1303 (1982).

8    **B.  Sufficient Evidence Was Presented As To Each Element Of Burglary.**

9    1.  The Elements of Burglary.

10    At trial, the jurors were instructed regarding second degree burglary as follows:

11   Every person who enters any automobile or other motor vehicle when the doors of the
   vehicle are locked with the specific intent unlawfully to steal, take, and carry away the
12   personal property of another of any value is guilty of the crime of burglary in violation
   of Penal Code section 459.

13   It does not matter whether the intent with which an automobile was entered was
14   thereafter carried out.

15   In order to prove this crime, each of the following elements must be proved:

16   1.  A person entered an automobile when the doors were locked; and
   2.  At the time of the entry, the person had the specific intent to steal, take, and carry
17   away someone else's property and intended to deprive the owner permanently of his
   or her property.

18  (CT 168-169; RT 271-272).

19    In California, vehicular burglary requires that the doors of a vehicle were locked at the time

20  of a defendant's entry and defendant must alter the vehicle's locked state in some fashion.  In re

21  James B., 109 Cal.App.4th 862, 870 (2003).  Thus, if a defendant removes property from the seat of

22  a vehicle merely by reaching through an open window, no burglary occurs.  People v. Woods, 112

23  Cal.App.3d 226, 230 (1980).  However, if defendant reaches through an open window to unlock the

24  doors, and then opens the door with the requisite intent to commit theft, he has committed a burglary.

25  In re James B., 109 Cal.App.4th at 870-871.  It is uncontroverted that the Honda was locked at the

26  time it was burglarized.

27  ///

28

1   It is unnecessary to prove a theft in order to establish burglary, only that the entry be effected

2   with the intent to steal or to commit any felony.  Cal. Pen. Code § 459; People v. Murphy, 173

3   Cal.App.2d 367, 373 (1959).  In a burglary prosecution, the evidence on which a defendant is

4   convicted may be purely circumstantial and if substantial, it is sufficient to support the judgment of

5   guilty.  Id.; People v. Colletta, 100 Cal.App.2d 1, 5 (1950).

6   Thus, contrary to Petitioner's assertions, it is not necessary that any of the witnesses should

7   have actually seen the defendant break and enter the premises, or that witnesses should have seen

8   him in the vicinity of the premises around the time the burglary was committed.  Murphy, 173

9   Cal.App.2d at 373.  Indeed, "[i]t rarely happens that an offense, like [burglary], can be proved by

10  witnesses who saw and recognized the defendant in the act, and resort must, therefore, ordinarily be

11  had to circumstantial evidence."  Id.; see People v. Russell, 195 Cal.App.2d 529, 532 (1961);

12  People v. Tyler, 258 Cal.App.2d 661, 667 (1968).

13  Regarding the intent element, California courts have long recognized that direct evidence of

14  specific intent is seldom available in burglary prosecutions, and the proof is almost entirely

15  circumstantial.  People v. Swenson, 28 Cal.App.2d 636, 639 (1938).  The jury in this case was given

16  the standard CALJIC No. 2.02 instruction that advised them that although specific intent may be

17  shown by circumstantial evidence, they could not find Petitioner guilty of burglary unless the

18  "proved circumstances are not only (1) consistent with the theory that the defendant had the required

19  specific intent and mental state but (2) cannot be reconciled with any other rational conclusion."

20  (CT 173).

21  As to the element of entry, in California any kind of entry, complete or partial, direct or

22  indirect, will satisfy the simple statutory requirement.  See People v. Allison, 200 Cal. 404, 407-408

23  (1927). Thus the defendant's arm, foot, or finger placed in an open door, window, or other aperture,

24  or through the glass of a window, is an entry.  Id.  Moreover, the entry may also be made through the

25  agency of an instrument or tool.  Id.  In Allison, the defendant's act of reaching for a ham handed to

26  him by a confederate who had broken into the locked train car was deemed an entry for purposes of

27  § 459.  Id.  The court reasoned that either the defendant reached his arms into the car to take the ham

28  or, at the least, when he took the ham from his confederate "his arm was extended by the length of

the ham to its contact with the hand of the other within the car," such as to constitute an "entry." Id.; see, e.g., People v. Moore, 31 Cal.App.4th 489, 491 (1994)(insertion of tire iron between screen and door constituted entry); People v. Walters, 249 Cal.App.2d 547, 551 (1967)(ceiling grill broken and rope inserted into room); People v. Failla, 64 Cal.2d 560, 569 (1966)(one foot on windowsill of room, the other poised in midair inside room constitutes entry); People v. Pettinger, 94 Cal.App. 297, 299 (1928)(breaking service station window and reaching in to take cash register).

2.   Sufficient Evidence Was Presented To Support A Conviction.

In this case, sufficient evidence was presented upon which any reasonable juror could have found each element of the offense of burglary beyond a reasonable doubt.   Certainly, sufficient circumstantial evidence was presented that Petitioner had "entered" the Honda, as that term is understood in California's burglary statute.   The Honda's doors were locked, its window had been smashed and items within the car had been strewn around the passenger compartment, thus circumstantially establishing that someone had illegally "entered" the locked car.   Petitioner was seen standing next to and peering into Fielding's car, which also had a smashed window.   Fielding's car was near the Honda in the parking lot.   Petitioner was followed from Fielding's car to the point where he was arrested.   Austin discovered Petitioner had gloves and a screwdriver nearby.   Fielding had earlier observed Petitioner with a blue bandanna in his hand.

Any reasonable juror could have concluded beyond a reasonable doubt that Petitioner used the gloves and bandanna to protect his hands while he pried the windows of the two cars with the screwdriver.   Any reasonable juror could easily have concluded beyond a reasonable doubt that Petitioner had done this to both the Honda and Fielding's car, although they convicted Petitioner of only burglarizing the Honda, having convicted Petitioner of the lesser included offense of attempted burglary as to Fielding's car.   This result is reasonable considering that nothing was missing from Fielding's car and no evidence was presented that the contents of that car had been disturbed.

However, and to directly address Petitioner's argument here, items within the Honda had been strewn around the passenger compartment of that car, indicating that whoever had broken the window had, necessarily, entered the car within the meaning of the burglary statute.   Since substantial circumstantial evidence was presented that Petitioner was that individual, it was

1   reasonable for the jury to find that Petitioner had effected an entry into the Honda. See Allison, 200

2   Cal. at 407-408.  Moreover, that same circumstantial evidence was sufficient to establish that

3   Petitioner had the requisite specific intent at the time he gained entry to the Honda.

4        In light of the foregoing, and viewing the evidence in the light most favorable to the

5   prosecution, this Court concludes that any rational trier of fact could have found the essential

6   elements of the crime of burglary of the Honda beyond a reasonable doubt.  Jackson, 443 U.S. at

7   319.  Thus, the state court did not make a determination that was contrary to or an unreasonable

8   application of clearly established federal law when it rejected Petitioner's contention.  Accordingly,

9   Ground Two must be denied.

10  **Ground Three        Petitioner was denied the effective assistance of both trial and appellate
                         counsel.**

11       Petitioner contends that he did not receive the effective assistance of counsel at either the trial

12  stage or on appeal.  Petitioner argues that trial counsel was ineffective in failing to pursue the

13  Miranda issue at trial and in objecting to the giving of CALJIC No. 17.41.1.  (Doc. 11, p. 8).  He

14  then criticizes appellate counsel for failing to raise the ineffectiveness of trial counsel and to further

15  argue the Miranda issue on appeal.  (Id. at pp. 8-9). These issues are without merit.

16       **A.  The Standard For Ineffective Assistance of Counsel**.

17       In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court

18  must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984);

19  Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's

20  performance was deficient, requiring a showing that counsel made errors so serious that he or she

21  was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at

22  687.  To establish this, the petitioner must show that counsel's representation fell below an objective

23  standard of reasonableness.  Id. at 688.  The petitioner must identify counsel's alleged acts or

24  omissions that were not the result of reasonable professional judgment considering the

25  circumstances.  Id.; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial

26  scrutiny of counsel's performance is highly deferential, and a court indulges a strong presumption

27  that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland,

28

1  466 U.S. at 687; <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994).

2        Second, a petitioner must show prejudice, i.e., whether counsel's errors were so egregious as

3  to deprive him of a fair trial, one whose result is reliable.  <u>Strickland</u>, 466 U.S. at 688, 694.  To

4  establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's

5  unprofessional errors, the result of the proceeding would have been different.  A reasonable

6  probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>; <u>Williams v.</u>

7  <u>Taylor</u>, 529 U.S. 362, 391, 120 S.Ct. 1495 (2000).   In so doing, the Court must also evaluate

8  whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.

9  <u>Id.</u>; <u>Quintero-Barraza</u>, 78 F.3d at 1345; <u>United States v. Palomba</u>, 31 F.3d 1456, 1461 (9th Cir.

10  1994).

11        The Court does not need to consider the two elements in any particular order, nor does the

12  Court need to consider both if the showing on either one is insufficient.  <u>Strickland</u>, 466 U.S. at 697.

13  A court need not determine whether counsel's performance was deficient before examining the

14  prejudice suffered by the petitioner as a result of the alleged deficiencies.  <u>Id.</u>  The object of an

15  ineffectiveness claim is not to grade counsel's performance.  <u>Id.</u>  "If it is easier to dispose of an

16  ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so, that

17  course should be followed."  <u>Id.</u>      With these principles in mind, the Court now turns to an

18  analysis of Petitioner's claims of ineffective assistance of counsel.

19        **B.  <u>Petitioner Was Not Denied the Effective Assistance of Counsel</u>**.

20        The Court has already discussed the <u>Miranda</u> issue and concluded that Petitioner was not

21  denied his constitutional rights by virtue of the state court's rulings.  In light of that determination, it

22  seems evident, ipso facto, that trial counsel's performance was not deficient for failing to adequately

23  pursue the <u>Miranda</u> issue at trial.  As Respondent correctly notes, trial counsel was successful in

24  having many of Petitioner's statements excluded; only the two preliminary responses to Officer

25  Austin were not kept from the jury.  Since the permitted comments were, as indicated in the first

26  section, properly admitted, trial counsel's failure to exclude those statements could not be deemed

27  insufficient under <u>Strickland</u>.

28  ///

Moreover, even if the comments were improperly admitted, there was no prejudice to Petitioner.  The purportedly inculpatory comments were (1) Petitioner's response giving his name, and (2) Petitioner's statement that he came from Tulare and was homeless.  Contrary to Petitioner's assertions, these comments were not inculpatory in any respect, they were unnecessary to establish that Petitioner was at the scene of the crime, and they certainly were not, by themselves, in any way probative of Petitioner's involvement in the two burglaries.

Next, as will be discussed in the following section, trial counsel's failure to object to CALJIC 17.41.1 was not ineffective assistance for the reasons set forth infra.  And even if, arguendo, it had been deficient, Petitioner has not been prejudiced because the Court agrees with California courts that have concluded that the prejudice flowing from giving such an instruction is not reversible.

Finally, if trial counsel was not ineffective in failing to pursue the Miranda issue with the zeal Petitioner expected and in not objecting to the challenged instruction, then appellate counsel's performance, which Petitioner challenges on the same grounds, was not deficient either.

**Ground Four:     The the trial court's decision to give CALJIC No. 17.41.1 violated Petitioner's Sixth and Fourteenth Amendment rights.**

Petitioner next argues that his Sixth and Fourteenth Amendment rights were violated when the trial court instructed the jury pursuant to CALJIC No. 17.41.1, which Petitioner alleges improperly intruded into and interfered with the jury's deliberative process.  (Doc. 11, p. 10.) Petitioner is again mistaken.

At trial, the attorneys and court discussed in camera which instructions were to be given to the jury.  At one point, the court indicated that a number of CALJIC instructions, including No. 17.41.1, would be given; there were no objections from either side.  (RT 220).

Generally, the issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49, 113 S.Ct. 2112 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal

1   habeas"). Thus, normally, a claim that challenges the propriety of a jury instruction under state law

2   cannot reasonably be construed to allege a deprivation of federal rights. Van Pilon v. Reed, 799 F.2d

3   1332, 1342 (9th Cir. 1986). Indeed, federal courts are bound by state court rulings on questions of

4   state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.).

5        A challenge to a jury instruction solely as an error under state law does not normally state a

6   claim cognizable in a federal habeas corpus action. See Estelle, 502 U.S. at 71-72. To obtain federal

7   collateral relief for errors in the jury charge, the petitioner must show that the ailing instruction by

8   itself so infected the entire trial that the resulting conviction violates due process. See id. at 72. The

9   constitutional significance of the omission of an instruction will depend upon the evidence in the

10  case and the overall instructions given to the jury. See Duckett v. Godinez, 67 F.3d 734, 745 (9th

11  Cir. 1995); see also Henderson v. Kibbe, 431 U.S. 145, 155, 97 S.Ct. 1730 (1977).

12       Additionally, the instruction may not be judged in artificial isolation, but must be considered

13  in the context of the instructions as a whole and the trial record. Id. The Court must evaluate jury

14  instructions in the context of the overall charge to the jury as a component of the entire trial process.

15  See United States v. Frady, 456 U.S. 152, 169, 102 S.Ct. 1584 (1982), citing Henderson v. Kibbe,

16  431 U.S. 145, 154, 97 S. Ct. 1730, 1736 (1977). Furthermore, even if it is determined that the

17  instruction violated the petitioner's right to due process, the petitioner can only obtain relief if the

18  unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

19  actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993)(whether the

20  error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna

21  v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

22       The burden of demonstrating that an erroneous instruction was so prejudicial that it will

23  support a collateral attack on the constitutional validity of a state court's judgment is even greater

24  than the showing required to establish plain error on direct appeal. Henderson v. Kibbe, 431 U.S. at

25  154. Moreover, an individual such as Petitioner in this case whose claim involves the *omission* of an

26  instruction "bears an especially heavy burden," because an omission is less likely to be prejudicial

27  than a purported misstatement of the law. Id. at 155.

28  ///

1    Under the foregoing authority, the Court must determine whether the challenged instruction

2  was so egregious that the resulting conviction violates due process.  Kibbe, 431 U.S. at 154.

3  Regarding the trial court's instruction on CALJIC 17.41.1., the jury was instructed as follows:

4          The integrity of a trial requires that jurors, at all times during their deliberations,
           conduct themselves as required by these instructions.  Accordingly, should it occur
5          that any juror refuses to deliberate or expresses an intention to disregard the law or
           to decide the case based on penalty or punishment, or any [other] improper basis, it
6          is the obligation of the other jurors to immediately advise the Court of the situation.

7  (CT 191; RT 279).

8    On appeal, the 5th DCA noted that People v. Engleman, 77 Cal.App.4th 1297 (2000), and

9  several other cases reviewing No. 17.41.1 had been granted review by the California Supreme Court

10 to determine the instruction's constitutionality,   (Doc. 18, Exh. B, p. 3).  The 5th DCA concluded

11 that "[e]ven if the California Supreme Court invalidates CALJIC No. 17.41.1, we find that the

12 instruction caused no prejudice here."  Id. at p. 4.  Noting that the evidence against Petitioner was

13 "overwhelming," that "nothing in the record demonstrates any juror had an inclination to acquit

14 [Petition] or convict him of a lesser crime," nor was there anything in the record "to show that there

15 was dissention among the jurors."  Id.  Thus, the court concluded that any error in giving the

16 instruction was harmless beyond a reasonable doubt.  Id.

17    Subsequent to Petitioner's appeal, the California Supreme Court, in People v. Engelman,

18 28 Cal.4th 436 (2002), directed state trial courts not to give CALJIC No. 17.41.1 in the future, based

19 on the state Supreme Court's concern that the instruction "has the potential to intrude unnecessarily

20 on the deliberative process and affect it adversely–both with respect to the freedom of jurors to

21 express their differing views during deliberations, and the proper receptivity they should accord the

22 views of their fellow jurors."  Engelman, 28 Cal.4th at 440-441, 449.

23    Nevertheless, the court held that the instruction did not violate the defendant's Sixth

24 Amendment right to a jury trial because the constitutional right does not require "absolute and

25 impenetrable secrecy for jury deliberations in the face of an allegation of juror misconduct," or

26 "constitute [ ] an absolute bar to jury instructions that might induce jurors to reveal some element of

27 their deliberations."  Id. at 443.

28 ///

1    As a preliminary matter, this Court notes that Petitioner has not cited, and the Court has been

2    unable to locate, any federal authority, let alone United States Supreme Court authority, holding that

3    CALJIC No. 17.41.1, or an instruction substantially similar to it, violates a defendant's federal

4    constitutional rights under the Sixth Amendment.  Absent such a "clearly established" federal law,

5    the Court has no basis for either finding or concluding that the California courts' rejection of

6    Petitioner's claim either was contrary to or involved an unreasonable application of clearly

7    established Supreme Court law.  28 U.S.C. § 2254(d)(1); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir.

8    2004)(affirming denial of habeas petition based upon giving of CALJIC 17.41.1 because of absence

9    of Supreme Court precedent clearly establishing that the instruction is unconstitutional).

10    Assuming, arguendo, that the issue is cognizable in a federal habeas case, the instruction,

11    contrary to Petitioner's assertions, does not intrude on or interfere with the ability of each juror to

12    deliberate independently and reach their own verdict.  The instruction does not require that each

13    word uttered in deliberations be reported or that holdout jurors be singled out and reported to the trial

14    judge.  Rather, the instruction attempts to ensure the proper functioning of the jury by enabling the

15    trial court to investigate jury misconduct when necessary.  The instruction on its face does not

16    misstate the law.  A juror may not refuse to deliberate, may not disregard the law, and may not

17    decide the case by relying on an improper basis.

18    The contention that the instruction chills the "independent" deliberations of jurors by forcing

19    jurors to essentially police one another is both abstract and speculative.  The instruction only

20    authorizes the jury to report a juror who is refusing to deliberate or follow instructions, not a juror

21    who is simply dissenting from the majority.  If jurors were to report a juror to the court simply on the

22    basis of dissenting, the jurors would not be following the instruction as written, as they are presumed

23    to do.  See Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997).

24    Moreover, the instruction contains no suggestion that jurors who disagree with other jurors

25    will be punished or suffer negative consequences.  While a reasonable juror might infer from the

26    instruction that the trial court would investigate any reports of misconduct, it would be unreasonable

27    for such jurors to also infer that the trial court would in some fashion mete out punishment to jurors

28    without first fully investigating such allegations to ensure that they were well-founded.

Petitioner's claim that the instruction deprived him of his right of jury nullification is equally unavailing.[4]  Jury nullification may be a reality in the courtroom, but it is not a right under the Constitution, laws, or treaties of the United States.  See Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999)(noting no right to jury nullification in the context of federal habeas review); cf. United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992)(federal defendants are not entitled to jury nullification instructions).[5]  Petitioner has not cited any Supreme Court authority for the proposition that he has a federal constitutional right to jury nullification, much less to an instruction to the jury itself that it may disregard the law in its deliberations.  Accordingly, there is not, in this regard, any clearly established federal law for the state court's decision either to contradict or to unreasonably apply.

In the absence of any such Supreme Court precedent, it simply cannot be maintained that the mere giving of CALJIC No. 17.41.1 was a violation of "clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. sec. 2254(d)(1); Brewer, 378 F.3d at 955.

In order to be entitled to federal habeas corpus relief, Petitioner must show that CALJIC No. 17.41.1 by itself so infected the entire trial that the resulting conviction violated due process.  See Estelle, 502 U.S. at 72.  He has not done so, nor has he shown that there is a "reasonable likelihood" that the jury applied the instruction in a manner that violated the Constitution. See Id.

Moreover, even assuming that the challenged instruction did violate Petitioner's Sixth Amendment rights as a matter of clearly established Supreme Court law, the Court has no basis for concluding that the giving of the instruction had a substantial and injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 637.  Considered as a whole, the instructions given to the jury accurately stated the law and advised the jurors that it was their duty to decide the

---

[4]Although Petitioner did not raise this specific aspect of the challenged instruction in his First Amended Petition, he did raise this issue in his direct appeal in the 5th DCA.  (Doc. 18, Exh. B, p. 4). Since, arguably, both issues are intertwined, the Court will address it here.

[5]In California, jurors have the ability to nullify or disregard the court's instructions and evidence, and to return a verdict contrary to the law and the evidence, but they have no right of nullification regarding the applicable legal principles that govern their role as factfinders.  People v. Williams, 25 Cal.4th 441, 454 (2001).

1   case based on their individual opinions.

2       Petitioner's allegations regarding the effect of the challenged instruction on jury deliberations

3   are unsupported by the record and conclusory.  Conclusory allegations do not warrant habeas relief.

4   See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (holding that conclusory allegations made

5   with no reference to the record or any document do not merit habeas relief).  Petitioner is unable to

6   demonstrate any act on the part of the jury that would suggest that the challenged instruction so

7   infected the entire trial that his conviction violates due process.  Indeed, as the 5th DCA's opinion

8   notes, there is no indication in this record that any problems occurred that were even arguably

9   attributable to the giving of CALJIC No. 17.41.1, e.g., jury deadlock, conflicts regarding holdout

10  jurors, refusal to follow the law, stifled deliberations, or intrusion by the trial judge into the

11  deliberative process.  (Doc. 18, Exh. B, p. 4).  Nor indeed, does Petitioner assert that anything of this

12  ilk occurred.

13      The state court resolution of this claim was not contrary to clearly established Federal law, as

14  determined by the Supreme Court of the United States, nor did the state court resolution result in a

15  decision that was based on an unreasonable determination of the facts in light of the evidence

16  presented. 28 U.S.C. § 2254(d). Accordingly, Ground Four must be denied.

17                                    **RECOMMENDATION**

18      For the foregoing reasons, the Court RECOMMENDS that Petitioner's First Amended

19  Petition for Writ of Habeas Corpus (Doc. 11), be DENIED.

20      This Report and Recommendation is submitted to the United States District Court Judge

21  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the

22  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

23  twenty (20) days after being served with a copy of this Report and Recommendation, any party may

24  file written objections with the Court and serve a copy on all parties.  Such a document should be

25  captioned "Objections to Magistrate Judge's Report and Recommendation."  Replies to the

26  Objections shall be served and filed within ten (10) court days (plus three days if served by mail)

27  after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to

28  28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified

time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **February 9, 2007**                                          **/s/ Theresa A. Goldner**
**j6eb3d**                                                        UNITED STATES MAGISTRATE JUDGE